**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| QUINTEROS CORNEJO,<br><br>Petitioner,<br><br>v.<br><br>ANDREWS, et al.,<br><br>Respondents. | Case No. 1:25-CV-02062 JLT HBK<br><br>ORDER GRANTING REQUEST FOR PRELIMINARY INJUNCTION AND REFERRING THE MATTER TO THE ASSIGNED MAGISTRATE JUDGE<br><br>(Doc. 4) |

## I.      INTRODUCTION

Before the Court for decision is Jose Antonio Quinteros Cornejo request for a temporary restraining order (Doc. 4) filed in conjunction with his petition for a writ of habeas corpus under 28 U.S.C. § 2241 challenging his ongoing immigration detention.  (Doc. 2.)  Having evaluated the TRO request, (Doc. 4), Respondents' opposition, (Doc. 9), Petitioner's reply, (Doc. 10), and considering the entire record, the Court converts the TRO into a preliminary injunction[1] ("PI"), **GRANTS** the PI, and **ORDERS** Petitioner's immediate release from custody upon Petitioner's posting of a $5,000 bond.  The Court **REFERS** the matter to the assigned magistrate judge for a

---

[1] When the Court set a briefing schedule on the motion, it ordered the parties to state their position as to whether the motion for temporary restraining order should be converted to a preliminary injunction and whether the parties sought a hearing on the motion.  (Doc. 5.)  Neither party objected to converting the motion to one for a preliminary injunction or requested a hearing.  (*See* Doc. 4; Doc. 4-4; Doc. 9.)  Given that the standards for issuing a temporary restraining order and a preliminary injunction are the same, and Respondents had notice and opportunity to respond, (Doc. 9), the Court converts Petitioner's motion to a motion for preliminary injunction.

determination on the merits.

## II.    FACTUAL & PROCEDURAL BACKGROUND

Petitioner is a native and citizen of El Salvador who was born on July 20, 2006.  (Doc. 4-4 at 7; Doc. 4-6 at 2, 4.)  On April 15, 2024, at the age of seventeen, he entered the United States (*Id*.; Doc. 4-7 at 2–4) and was apprehended by U.S. Border Patrol at the Rio Grande Valley sector in Texas.  (Doc. 4-4 at 7; Doc. 4-7 at 3.)  That day, Department of Homeland Security issued a Notice to Appear charging the Petitioner as removable under Immigration and Nationality Act ("INA") § 212(a)(6)(A)(i), codified in 8 U.S.C. § 1182(a)(6)(A)(i), for being present without admission or parole.  (Doc. 4-8 at 2.)  DHS also issued a Notice of Custody Determination stating that Petitioner would be detained pursuant to INA § 236, codified in 8 U.S.C. § 1226.  (Doc. 4-9 at 2.)  Soon after his detention, DHS transferred him to the custody of the U.S. Department of Health and Human Services ("HHS"), Office of Refugee Resettlement, because he was an unaccompanied child under 8 U.S.C. § 1232(b)(3).  (Doc. 4-4 at 8; *see also* Doc. 4-10 at 2.)

On May 11, 2024, HHS released the Petitioner pursuant to Section 235 of the 2008 William Wilberforce Trafficking Victims Protection Reauthorization Act ("TVPRA"), codified in 8 U.S.C. § 1232.  (Doc. 4-10 at 2.)  HHS released him to custody of his aunt, Ana De Gomez, who agreed to care for him as his sponsor while his immigration proceedings were ongoing.  (*Id*.; *see also* Doc. 4-14 at 2.) Since his release and prior to his re-detention in November 2025, Petitioner continuously lived with his aunt in Mendota, California.  (Doc. 4-14 at 2.)  On July 16, 2024—four days before he turned 18—Petitioner filed an application for asylum under the TVPRA.  (Doc. 4-11 at 2; Doc. 4-4 at 8.) On January 27, 2025, DHS approved Petitioner's application for work authorization.  (Doc. 4-12 at 2.)

On November 3, 2025, the Fresno County Superior Court appointed Petitioner's aunt as his legal guardian and issued "Special Immigrant Juvenile Findings," (Doc. 4-13 at 2–6), which according to Petitioner, provide the "necessary evidentiary basis" for him to obtain special immigrant juvenile status needed to apply for a lawful permanent residency.  (Doc. 4-4 at 9 n.1.) This is consistent with the Immigration Judge's subsequent finding that Petitioner is now

2

"eligible to file an I-360 petition" as a special immigrant juvenile.[2] (Doc. 4-16 at 2.) During the year and a half while on release, Petitioner integrated into his aunt's household, helped with chores, and obtained a job. (Doc. 4-14 at 2.)

On November 9, 2025, when Petitioner appeared for a scheduled check-in, ICE arrested him. (Doc. 4-4 at 9.) He was nineteen years old at the time. (*See* Doc. 4-6 at 2, 4.) According to Petitioner, while on release, he "complied with all immigration requirements and conditions of his release," (Doc. 4-4 at 8), and his "re-detention was not based on any criminal activity or violation of release conditions." (*Id*. at 9.) Petitioner reports that he has no criminal history in the United States or in El Salvador, which is supported by the record. (Doc. 4-4 at 8; *see also* Doc. 4-7 at 3; Doc. 4-16 at 2.) Respondents present no evidence or arguments to the contrary. (*See* Doc. 9.) Instead, Respondents argue that Petitioner's continued detention is warranted because he is "subject to mandatory detention pursuant to U.S.C. § 1225(b)(2)." (Doc. 9 at 1.)

On December 23, 2025, about a month after being in ICE custody, the IJ conducted a custody redetermination upon Petitioner's request pursuant to 8 C.F.R. § 1236. (Doc. 4-16 at 2.) At this hearing, Respondents argued only that Petitioner is subject to mandatory detention. (Doc. 12-1 at 2) The IJ considered this argument and Petitioner's history and circumstances:

> Here, the record provides that Respondent does not have a criminal history in the United States. Accordingly, the Court will only analyze whether Respondent presents an unacceptable flight risk. Based on the evidence in the record, the Court found Respondent does not pose an unacceptable flight risk. Respondent is 19 years old, and has been in the United States since April 2024. He has continuously resided with his aunt, who has Lawful Permanent Resident status, since his release from the Office of Refugee Resettlement's custody. He is designated as an Unaccompanied Child, and has a pending asylum application with U.S.

---

[2] According to U.S. Citizenship and Immigration Services, an I-360 Petition is used to classify an alien as a special immigrant, such as a juvenile who needs protection of a juvenile court because they have been abused, neglected or abandoned by a parent." USCIS, *I-360 Petition for Amerasian, Widow(er), or Special Immigrant*, https://www.uscis.gov/i-360 (last visited Jan. 23, 2026). To apply for such status, the alien juvenile must provide a "court order or administrative documents that establish eligibility for SIJ classification." USCIS, *Checklist of Required Initial Evidence for Form I-360*, https://www.uscis.gov/forms/filing-guidance/checklist-of-required-initial-evidence-for-form-i-360-for-informational-purposes-only (last visited Jan. 23, 2026). As the record demonstrates, Petitioner had already obtained a court order establishing his eligibility for SIJ, thereby entitling him to file an I-360 Petition. (Doc. 4-13 at 5–6.) That court order indicates that Petitioner is a victim of parental abuse and abandonment, and it is not in his best interest to return to El Salvador due to his parents past abusive treatment, which is likely to resume if he returns to El Salvador where they reside. (*Id*.)

> Citizenship and Immigration Services. A Fresno County Superior Court also issued the predicate finding for Respondent to seek Special Immigrant Juvenile Status.
> While the Court does not condone Respondent's unlawful entry into the United States, this sole violation of this country's immigration laws, is not so egregious that a meaningful bond amount, could not mitigate the flight risk. The Court determined, based on the totality of the circumstances, bond in the amount of $5,000, is necessary and sufficient to mitigate the flight risk and reasonable in light of Respondent's access to resources through Respondent.

*Id.* at 4. Thus, the IJ ordered Petitioner released on a $5,000 bond. *Id.* Respondents reserved the right to appeal the IJ's custody determination to the Board of Immigration Appeals, and the IJ set a deadline of January 22, 2026, to appeal. (Doc. 4-16 at 3.) On December 23, 2025, Respondents served to the Petitioner and filed a "Notice of ICE Intent to Appeal Custody Redetermination". (Doc. 4-15 at 2.) This resulted in the IJ's bond determination being automatically stayed pending review by the BIA. *See* 8 C.F.R. § 1003.19(i)(2); (Doc. 4-4 at 10.) Petitioner has been detained nearly three months (Doc. 4-4 at 9.) The automatic stay regulation provides that the stay of Petitioner's release will continue until the BIA issues a decision on the Government's appeal. 8 C.F.R. § 1003.19(i)(2).

On December 29, 2025, Petitioner filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241, alleging that his Fifth Amendment due process rights have been violated because (1) he was detained without a pre-deprivation bond hearing; (2) he is entitled to placement in the "least restrictive setting" as an unaccompanied alien child under TVPRA 8 U.S.C. § 1232(c)(2)(B); and (3) the automatic stay provision invoked by the Government under 8 C.F.R. § 1003.19(i)(2) violates the due process clause. (Doc. 2 at 8–14.) Petitioner requests this Court (1) declare that his detention under 8 U.S.C. § 1225 is unlawful; (2) declare that Respondents violated 8 U.S.C. § 1232(c)(2)(B) by failing to consider placement in the least restrictive setting; (3) declare that Respondents violated the Fifth Amendment by failing to provide a pre-deprivation hearing prior to his detention; (4) declare that the automatic stay enumerated in 8 C.F.R. § 1003.19(i)(2) violates the Fifth Amendment; (5) vacate the automatic stay and order Petitioner's immediate release from custody, or order his immediate release upon the posting of a $5,000 bond; and (6) enjoin Respondents from re-detaining Petitioner without a pre-deprivation hearing

4

and from re-invoking the automatic stay regulation.[3]  (Doc. 2 at 14–15.)  On January 2, 2026, Petitioner filed a motion for a TRO, reiterating the same arguments and requesting the same relief.  (Doc. 4-4 at 10–19.)

On January 5, 2026, the Court issued a Minute Order calling for the filing of an opposition and reply related to the TRO.  (Doc. 5.)  On January 16, 2026, Respondents filed an opposition, (Doc. 9), and on January 19, 2026, Petitioner filed a reply, (Doc. 10).[4]

As of January 26, 2026, there was no indication that Respondents filed a notice of appeal with the BIA.  Moreover, the Executive Office for Immigration Review's case information website, it indicated that "[n]o appeal was received for this case."  EOIR, Automated Case Information, https://acis.eoir.justice.gov/en/caseinformation (last visited Jan. 26, 2026).  The recorded indicated only that Respondents served the EOIR-43 "Notice of Intent to Appeal" on the Petitioner, (Doc. 4-15 at 2), and filed such notice with the immigration court.  (Doc. 4-4 at 10); see also 8 C.F.R. § 1003.19(i)(2) ("any order of the immigration judge authorizing release (on bond or otherwise) shall be stayed upon DHS's filing of a notice of intent to appeal the custody redetermination (Form EOIR-43) with the immigration court within one business day of the order"). After the Court ordered an update, Respondents provided evidence that the Notice of Appeal was filed around January 2, 2026.[5]  (Doc. 12-2) In this filing, Respondents explain that they continue to press the issue that Petitioner is subject to mandatory detention.

Having considered the entire record, the Court **GRANTS** the request for preliminary injunctive relief and refers the matter to the assigned magistrate judge for a determination on the

---

[3]  Petitioner also requests this Court declare he is a member of the bond eligible class in *Maldonado Bautista v. Noem*, No. 5:25-cv-01873-SSS-BFM, 2025 WL 3678485 (C.D. Cal. Dec. 18, 2025) and award Petitioner costs and attorney's fees pursuant to the Equal Access to Justice Act.  (Doc. 2 at 14–15.) The court declines to consider this issue at this time. Rather, this issue can be raised during the briefing on the merits.

[4]  As Petitioner notes, (Doc. 10 at 2), Respondents filed their opposition one day past the deadline and failed to provide relevant portions of Petitioner's A-File, as instructed by this Court's minute order.  (*See* Doc. 5; Doc. 9.)  Nonetheless, given that Petitioner provided relevant portions of his A-File, (*see* Doc. 4-4 at 5), and considering the opposition was only one day late, the Court considers the opposition in deciding the present motion.

[5] Respondents do not explain why they did not raise this information in their opposition to the motion for temporary restraining order.

merits.

### III.    JURISDICTION

Under 28 U.S.C. § 2241, the Court has the authority to determine a petition for writ of habeas corpus in which the petitioner asserts he is being held in custody "in violation of the Constitution or laws or treaties of the United States."  "The essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and that the traditional function of the writ is to secure release from illegal custody."  *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973). Petitioner seeks his immediate release from custody, which he contends violates the Fifth Amendment Due Process Clause under the United States Constitution.  (*See* Doc. 2 at 11–14; Doc. 4-4 at 13–17.)  Thus, he properly invokes the Court's habeas jurisdiction.

The INA limits judicial review in many instances.  Though 8 U.S.C § 1252(g) precludes this Court from exercising jurisdiction over the executive's decision to "commence proceedings, adjudicate cases, or execute removal orders against any alien," there is no removal order at issue here and the central issue is Petitioner's continued detention.  Thus, this Court has the authority to review Petitioner's detention.  *See Jennings v. Rodriguez*, 583 U.S. 281, 294 (2018) (holding that § 1252(g) precludes judicial review only as to the three areas specifically outlined in the subsection); *see also Reno v. American–Arab Anti–Discrimination Comm.*, 525 U.S. 471, 482 (1999).

### IV.    Exhaustion of Administrative Remedies

As a prudential matter, habeas petitioners must exhaust available judicial and administrative remedy remedies before seeking relief. 28 U.S.C § 2241; *see also Castro-Cortez v. I.N.S.*, 239 F.3d 1037, 1047 (9th Cir. 2001), overruled on other grounds by *Fernandez-Vargas v. Gonzales*, 548 U.S. 30, 126 (2006). Courts may require exhaustion as a prudential matter when "(1) agency expertise makes agency consideration necessary to generate a proper record and reach a proper decision; (2) relaxation of the requirement would encourage the deliberate bypass of the administrative scheme; and (3) administrative review is likely to allow the agency to correct its own mistakes and to preclude the need for judicial review." *Noriega-Lopez v. Ashcroft*, 335 F.3d 874, 881 (9th Cir. 2003) (citation omitted); *Puga v. Chertoff,* 488 F.3d 812, 815 (9th

Cir. 2007). If a petitioner fails to exhaust prudentially required administrative remedies, then "a district court ordinarily should either dismiss the petition without prejudice or stay the proceedings until the petitioner has exhausted remedies." *Leonardo v. Crawford*, 646 F.3d 1157, 1160 (9th Cir. 2011). However, the exhaustion requirement may be waived if "administrative remedies are inadequate or not efficacious, pursuit of administrative remedies would be a futile gesture, irreparable injury would result, or the administrative proceedings would be void." *Laing v. Ashcroft,* 370 F.3d 994, 1000 (9th Cir. 2004) (quotation marks and citation omitted). Because Respondents admit that their sole argument at the bond hearing and on appeal concerns their position that Petitioner is subject to mandatory detention, which this Court has repeatedly rejected and does so here, the Court finds that administrative exhaustion is futile and would impose irreparable harm on Petitioner. Thus, the requirement of exhaustion is excused. *See Ortega-Rangel v. Sessions*, 313 F. Supp. 3d 993, 1003 (N.D. Cal. 2018).

## V.    ANALYSIS

The standard for issuing a TRO is the same as the standard for issuing a preliminary injunction. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n. 7 (9th Cir. 2001) (explaining that the analysis for temporary restraining orders and preliminary injunctions is "substantially identical"). When seeking a TRO or PI, plaintiffs must establish: (1) they are "likely to succeed on the merits" of their claims, (2) they are "likely to suffer irreparable harm in the absence of a preliminary injunction," (3) "the balance of equities tips in [their] favor" and (4) "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The moving party has the burden to "make a showing on all four prongs" of the *Winter* test to obtain a preliminary injunction. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). Thus, the moving party has "the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997); *Hecox v. Little*, 104 F.4th 1061, 1073 (9th Cir. 2023). The Court may weigh the request for a preliminary injunction with a sliding-scale approach. *Alliance*, at 1135 (9th Cir. 2011). Accordingly, a stronger showing on the balance of hardships may support the issuance of a preliminary injunction where there are "serious questions on the merits . . . so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the

7

injunction is in the public interest." *Id.* "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter*, 555 U.S. at 24. Preliminary injunctions are intended to "merely [] preserve the relative positions of the parties until a trial on the merits can be held, and to balance the equities at the litigation moves forward." *Lackey v. Stinnie*, 604 U.S. ___, 145 S. Ct. 659, 667 (2025) (citations omitted).

The status quo refers to "the last uncontested status which preceded the pending controversy." *Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804, 809 (9th Cir. 1963) (quoting *Westinghouse Elec. Corp. v. Free Sewing Mach. Co.*, 256 F.2d 806, 808 (7th Cir. 1958)). In the Court's view, that is the status before Petitioner was arrested. *See Kuzmenko v. Phillips,* No. 25-CV-00663, 2025 WL 779743, at *3 (E.D. Cal. Mar. 10, 2025) (granting a temporary restraining order requiring immediate release of the petitioner back to home confinement from custody, as a restoration of the status quo).

**A.  Likelihood of Success on the Merits**

This first factor "is the most important" under *Winter*, and "is especially important when a plaintiff alleges a constitutional violation and injury." *Baird v. Bonta*, 81 F.4th 1036, 1041 (9th Cir. 2023). Petitioner argues he is likely to succeed on his due process claim because (1) he is not subject to 8 U.S.C. § 1225(b)(2)'s mandatory detention provision; (2) he is entitled to the "least restrictive setting" under 8 U.S.C. § 1232(c)(2)(B); (3) Respondents failed to provide a pre-deprivation hearing prior to his re-detention; and (4) the automatic stay provision in 8 C.F.R. § 1003.19(i)(2) is unconstitutional. (Doc. 4-4 at 10–17.) Respondents fail to address these arguments and instead claim, in a conclusory fashion, that Petitioner's detention is mandatory under 8 U.S.C. § 1225(b)(2). (Doc. 9 at 1–2.)

*1.  Petitioner Is Not Subject to Mandatory Detention Under § 1225(b)(2).*

8 U.S.C. §§ 1225 and 1226 govern the detention of non-citizens who are not yet subject to a final order of removal. *Otilio B.F. v. Andrews*, No. 1:25-cv-01398-KES-EPG, 2025 WL 3152480, at *4 (E.D. Cal. Nov. 11, 2025); *Ortiz Donis v. Chestnut*, 1:25-cv-01228-JLT-SAB, 2025 WL 2879514 at *3 (E.D. Cal. Oct. 9, 2025). Section 1225 governs the detention of non-citizens *seeking admission into* the United States, while Section 1226 governs the detention of

non-citizens *already in the country* pending the outcome of their removal proceedings. *See Jennings v. Rodriguez*, 583 U.S. 281, 289 (2018) (emphasis added). Detention under § 1225(b)(2)(A) is considered mandatory and individuals detained under this provision are not entitled to a bond hearing, unless release on parole is justified for urgent humanitarian reasons or significant public benefit. *See* 8 U.S.C. §§ 1225(b)(2)(A), 1182(d); *Otilio B.F.*, 2025 WL 3152480, at *4 (citations and quotations omitted).

However, § 1226(a) establishes a discretionary detention framework where the immigration officer first determines whether to detain or release the non-citizen while their immigration case is ongoing. 8 U.S.C. § 1226(a); *Otilio B.F.*, 2025 WL 3152480, at *5 (citations and quotations omitted). After that decision has been made, the non-citizen may request a bond hearing before an IJ. 8 C.F.R. § 1236.1(c)(8), (d)(1). At that bond hearing, "the burden is on the non-citizen to 'establish to the satisfaction of the [IJ] . . . that he or she does not present a danger to persons or property, is not a threat to the national security, and does not pose a risk of flight." *Hernandez v. Sessions*, 872 F.3d 976, 982 (9th Cir. 2017) (citing *In re Guerra*, 24 I. & N. Dec. 37, 38 (BIA 2006)).

DHS and BIA's current position is that Section 1225(b)(2)(A) applies to *all* non-citizens present in the United States without admission. *See Matter of Yajure Hurtado*, 29 I. & N. Dec. 216 (BIA 2025); *see also Ortiz Donis*, 2025 WL 2879514 at *5–6 (explaining DHS's recent change in position). Such expansive interpretation of § 1225(b)(2) is unlawful as applied to non-citizens who have been released by DHS on their own recognizance into the interior of the country. *Ortiz Donis*, 2025 WL 2879514 at *7 (citing *Salcedo Aceros v. Kaiser*, No. 25-cv-06924-EMC, 2025 WL 2637503, at *8–9 (N.D. Cal. Sept. 12, 2025)). This court and many others nationwide have repeatedly rejected such argument and found DHS's new policy to be unlawful. *See Otilio B.F.*, 2025 WL 3152480, at *5 ("That interpretation of the statute (1) disregards the plain meaning of section 1225(b)(2)(A); (2) disregards the relationship between sections 1225 and 1226; (3) would render a recent amendment to section 1226(c) superfluous; and (4) is inconsistent with decades of prior statutory interpretation and practice."); *id*. at 5 n.6 (citing the various courts in other districts that have reached similar conclusions); *Ortiz Donis*,

9

2025 WL 2879514 at *7–11.

In *Salcedo Aceros*, the court granted petitioner's request for immediate release, finding that the Government's attempt to characterize her detention as mandatory under Section 1225(b)(2) did not hold merit. *Salcedo Aceros*, 2025 WL 2637503, at *5, 8–9. Instead, where a non-citizen is apprehended upon entry into the United States and then released by DHS on their own recognizance, the individual is deemed detained under 8 U.S.C. § 1226(a). *Id*. at *4, 8–9 ("[Petitioner] enjoys a liberty interest under § 1226(a) and the procedural protections thereunder [] cannot be unilaterally abrogated without proceed by the Government simply 'switching tracks.'") (citations omitted). Similarly, in *Ortiz Donis*, the Court found that petitioner, who was apprehended at the border and released on his own recognizance, was not an "arriving alien" or an "applicant seeking admission" under § 1225(b)(2). *Ortiz Donis*, 2025 WL 2879514 at *1, 8 (referencing the implementing regulation, 8 C.F.R. § 235.3, which explains that § 1225(b)(2) applies to "any arriving alien," and that petitioner never had such categorization on his notice to appear). In *Otilio B.F.*, the Court found that petitioner was "not actively 'seeking' 'lawful entry' under § 1225(b)(2)(A) because he had already *entered* the United States over twenty years ago" and if anything was "seeking to *remain* in the United Staes." *Otilio B.F.*, 2025 WL 3152480, at *6–7 (granting the immediate release upon payment of bond of a non-citizen who had been in the country for years and had a pending U-Visa application); *see also Lopez Benitez v. Francis*, 795 F. Supp. 3d 475, 488 (S.D.N.Y. 2025) ("If, as [r]espondents argue, § 1225(b)(2)(A) were intended to apply to all 'applicant[s] for admission,' there would be no need to include the phrase 'seeking admission' in the statute.").

Though not perfectly analogous, Petitioner's situation presents similarities to the above-referenced cases. First, Petitioner was apprehended upon entry into the U.S., was charged as removable under INA § 212(a)(6)(A)(i), was given a notice to appear which *did not* categorize him as an "arriving alien," and was given notice that he was being detained under 8 U.S.C. § 1226. (Doc. 4-7 at 2–4; Doc. 4-8 at 2; Doc. 4-9 at 2); *cf. Salcedo Aceros*, 2025 WL 2637503, at *8–9; *Ortiz Donis*, 2025 WL 2879514 at *1, 8. Additionally, Petitioner requested a custody redetermination proceeding pursuant to 8 C.F.R. § 1236, (Doc. 4-16 at 2), which is a procedure

that follows a discretionary detention determination under 8 U.S.C. § 1226. *Otilio B.F.*, 2025 WL 3152480, at * 5 (citing 8 C.F.R. § 1236.1(c)(8), (d)(1) to explain that a non-citizen may request a bond hearing with an IJ after the immigration officer makes the initial discretionary decision to detain them under § 1226(a)). This all suggests that Petitioner is subject to detention under § 1226(a).

Although DHS did not release the Petitioner on his own recognizance when first apprehended, (*see* Doc. 4-9 at 2), he was eventually transferred to HHS custody as an unaccompanied non-citizen minor where within a month HHS released him to the custody of his aunt. (Doc. 4-10 at 2); *see* 8 U.S.C. §1232(b)(3) ("Except in the case of exceptional circumstances, any department or agency of the Federal Government that has an unaccompanied alien child in custody shall transfer the custody of such child to the Secretary of Health and Human services not later than 72 hours after determining that such child is an unaccompanied alien child."). He was thus similarly released into the "interior of the country," suggesting that § 1225(b)(2) is unlawful as applied to him. *Cf. Ortiz Donis*, 2025 WL 2879514 at *7.

After HHS released him on May 11, 2024, Petitioner lived with his aunt for eighteen months, received a work authorization, applied for asylum and special immigrant juvenile status, and obtained a job. (Docs. 4-11, 4-12, Doc. 4-13, 4-14.) As in *Otilio B.F.*, Petitioner is not seeking entry into the U.S., but rather already entered almost two years ago. *Otilio B.F.*, 2025 WL 3152480, at *6–7. And, as the record demonstrates, he has made every effort to remain in the country. *Id.*; *Lopez Benitez*, 795 F. Supp. 3d at 489 (explaining that those who already entered the country are not still seeking admission, but rather now seek a lawful means of remaining in the country).

Additionally, this Court has formerly rejected Respondents' position that § 1225(b) allows the government to re-detain a petitioner who was formerly released as an unaccompanied alien minor. As this Court explained in *R.D.TM.*,

> Respondents' argument that the government could re-detain petitioner under § 1225(b), even though she was previously designated an unaccompanied minor child, is unpersuasive. The detention of unaccompanied minor children is governed by the TVPRA, which does not mandate detention. 8 U.S.C. §

1232([c])(2)(A)–(B). The TVPRA provides that the government shall place unaccompanied minor children "in the least restrictive setting that is in the best interest of the child." *Id.* Petitioner was designated an unaccompanied minor child under the TVPRA when she arrived in the United States. Under the terms of a class action settlement agreement in *J.O.P. v. U.S. Dep't. of Homeland Security*, USCIS, the agency adjudicating her asylum application, is forbidden from re-assessing whether she qualifies as an unaccompanied minor child, even though she has since turned eighteen . . . . *See J.O.P. v. U.S. Dep't of Homeland Security*, 338 F.R.D. 33, 44, 64 (D. Md. 2019) (entering a class-wide preliminary injunction reinstating the 2013 Kim Memorandum, which provided that the government would not reassess whether an individual qualified as an unaccompanied child under the TVPRA even if the applicant had turned or been reunited with a parent).

*R.D.T.M. v. Wofford,* No. 1:25-cv-01141-KES-SKO, 2025 WL 2686866, at *4 (E.D. Cal. Sept. 18, 2025). Similarly, here, when DHS transferred the Petitioner to the custody of HHS upon apprehending him at the border, they designated him as an unaccompanied alien child under the TVPRA. (*See* Doc. 4-7 at 2–4; Doc. 4-10 at 2); 8 U.S.C. §1232(b)(3) ("[A]ny department . . . of the Federal Government that has an unaccompanied alien child in custody shall transfer the custody of such child to [HHS] not later than 72 hours *after determining that such child is an unaccompanied alien child*.") (emphasis added). Respondents fail to identify its authority to reassess Petitioner's status, particularly where Petitioner's immigration case and asylum application are still pending. (*See* Doc. 9; Doc. 4-11 at 2); *R.D.T.M.*, 2025 WL 2686866, at *4. In sum, Petitioner is not subject to mandatory detention under § 1225(b)(2)(A).

> 2. *Petitioner Is Entitled to a Pre-Deprivation Hearing Prior to Re-Detention Under the TVPRA 8 U.S.C. § 1232(c)(2)(A).*

The TVPRA, codified in 8 U.S.C. § 1232, governs the detention of unaccompanied minors encountered at the border. The statute provides that, in making custody determinations, HHS should consider "danger to self, danger to the community, and risk of flight." 8 U.S.C. § 1232(c)(2)(A). In releasing Petitioner on May 11, 2024, HHS must have determined that he was neither a flight risk nor a danger to the community. *Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1176, 1178 (N.D. Cal. 2017) ("[Immigration officials] may release the minor to a 'sponsor' . . . so long as the minor is not dangerous . . . Release [therefore] reflects a determination by the

government that the noncitizen is not a danger to the community or a flight risk."), *aff'd* 905 F.3d 1137 (9th Cir. 2018).  The TVPRA statutes further contemplate using the "least restrictive setting" regarding placement for minors in HHS custody and placement for minors in DHS custody after turning 18 years old.  *See* 8 U.S.C. § 1232(c)(2)(A)–(B).  With this framework in mind, the Court finds that Petitioner has a protected liberty interest, which required a pre-deprivation hearing[6] prior to his detention on November 9, 2025.  Respondents' failure to provide such hearing constitutes a due process violation.

In *R.D.T.M.*, this Court found that the petitioner, an unaccompanied alien minor who was formerly released under the TVPRA, had a protected liberty interest.  *R.D.T.M.*, 2025 WL 2686866, at *4–5 (citing *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972)).  The Court explained, for two-and-a-half years, petitioner was allowed to live with her family, graduated high school, and became lawfully employed.  *R.D.T.M.*, 2025 WL 2686866, at *5.  Further, the government's release of petitioner in 2023 reflected a determination that she did not pose a flight risk or danger to the community.  *Id.* (citing *Saravia*, 280 F. Supp. 3d at 1176).  The government also acknowledges that petitioner has no criminal record, complied with her release terms, and appeared at all immigration proceedings as required.  *Id.* (explaining that the government failed to show changed circumstances to justify her re-detention which contradicts the "implicit promise that [petitioner's freedom] will be revoked only if [she] fails to live up to the [release] conditions") (citing *Morrissey*, 408 U.S. at 482).  Upon assessing the risk of erroneous deprivation of petitioner's liberty interest, and the government's interest in detaining petitioner without a hearing, the Court found that Petitioner was likely to prevail on the merits.  *Id.* at 5–7 (quoting the factors enumerated in *Matthews v. Eldridge*, 424 U.S. 319, 335 (1976)).

Similarly, Petitioner has a protected liberty interest, which arose from his prior release from physical restraint.  (*See* Doc. 4-10 at 2.)  For a year and a half prior to his re-detention, his aunt became his legal guardian, he meaningfully integrated into his aunt's family, obtained work

---

[6] Although Petitioner received a post-deprivation hearing about a month after his re-detention under 8 U.S.C. § 1226(a) and 8 C.F.R. §1236.1, (*see* Doc. 4-16 at 2), he was not provided a pre-deprivation hearing where the government bore the burden of showing a material change in circumstances to justify his re-detention.

authorization, and maintained lawful employment.  (Doc. 4-12 at 2; Doc. 4-13 at 2–4; Doc. 4-14 at 2.)  When released from HHS custody on May 11, 2024, (Doc. 4-10 at 2), the government determined he was neither a flight risk nor a danger to the community.  *See Saravia*, 280 F. Supp. 3d at 1176; 8 U.S.C. § 1232(c)(2)(A).  Respondents acknowledge that Petitioner has no criminal record, (*see* Doc. 4-7 at 3.)  Respondents also fail to show or allege that Petitioner violated a condition of release.  (Doc. 9.)  To the contrary, Petitioner claims that he "complied with all immigration requirements and conditions of his release" during the eighteen months while on release.  (Doc. 4-4 at 8.)

Respondents further fail to show or allege that changed circumstances justify Petitioner's re-detention.  (*Id*.)  To the contrary, the IJ found that the Petitioner was not a danger to society.  (Doc. 4-16 at 2–3.)  And though the IJ found that Petitioner posed a risk of flight, she nonetheless determined that such risk may be mitigated by a $5,000 bond.  (*Id*.)  Additionally, Petitioner has a heightened liberty interest as an unaccompanied alien minor under TVPRA.  8 U.S.C. § 1232(c)(2)(B) mandates "placement in the least restrictive setting available after taking into account the alien's danger to self, danger to the community, and risk of flight."  The IJ already considered such factors and determined that the least restrictive setting for the Petitioner was release on bail.  (Doc. 4-16 at 2–3.)

Obtaining a post-deprivation hearing in this context provides little protection for the Petitioner, considering Respondents can invoke a discretionary stay of such decision whenever they see fit.  8 C.F.R. § 1003.19(i)(2) (explaining that the regulation may be invoked "in any case in which DHS has determined that an alien should not be released . . ."); *see also Herrera v. Knight*, No. 2:25-cv-01366-RFB-DJA, 2025 WL 2581792, at *10 (D. Nev. Sept. 5, 2025) ("Such an undefined and subjective standard clearly creates a likelihood of arbitrary and capricious application.").  Instead, a pre-deprivation hearing, provided *before* the Petitioner is detained, is necessary to protect Petitioner's liberty interest.  *R.D.T.M.*, 2025 WL 2686866, at *6 ("The root requirement of the Due Process Clause is that an individual be given an opportunity for a hearing before he is deprived of any significant protected interest.") (citations and quotations omitted).  Finally, as in *R.D.T.M.*, the government's interest in detaining Petitioner without a pre-

deprivation hearing is low where such custody hearings are routine and impose minimal costs. *Id.*

Considering (1) Petitioner's unique status under the TVPRA; (2) Petitioner's prior conditional release where HHS determined he was not a flight risk or danger; (3) Respondents' failure to provide a pre-deprivation hearing; and (4) Respondents' automatic stay of the IJ's post-deprivation decision to release the Petitioner on bail, Petitioner is likely to succeed on the merits of his due process claim.

> 3. *Petitioner's Continued Detention Through the Automatic Stay Regulation Violates Due Process.*

Petitioner contends that his continued detention under the automatic stay regulation violates due process. (Doc. 4-4 at 15.) The Court finds that the automatic stay regulation, as applied to Petitioner, violates his due process rights. *See Otilio B.F.*, 2025 WL 3152480, at *9–11. "Courts to address this issue have begun by noting that, for due process purposes, invoking the automatic stay 'is a separate act of detention' from the initial act of detaining a noncitizen suspected to be in the country illegally." *Id.* at 9 (citing *Silva v. Larose*, No. 25-cv-2329-JES-KSC, 2025 WL 2770639, at *3 (S.D. Cal. Sept. 29, 2025)). Both the initial act and subsequent act "require valid authority and due process." *Herrera*, 2025 WL 2581792, at *9. To assess whether the secondary act of detention is lawful, courts again apply the *Matthews* factors. *Otilio B.F.*, 2025 WL 3152480, at *9–10 (citing *Mathews*, 424 U.S. at 335).

DHS's initial act of re-detention was not justified under 8 U.S.C. §1225(b)(2), nor was it justified under 8 U.S.C. §1232(c)(2)(A) because Petitioner was entitled to a pre-deprivation hearing after having been on parole for eighteen months and in compliance with the terms of his release. Additionally, the secondary act of detention, through the government's automatic stay of the IJ's decision, was similarly unjustified under 8 U.S.C. § 1232(c)(2)(B). This provision is now at play because Petitioner was over the age of 18 when DHS detained him. (Doc. 4-4 at 8–9); 8 U.S.C. § 1232(c)(2)(B) ("If a minor described in subparagraph (A) reaches 18 years of age and is transferred to the custody of the Secretary of Homeland Security, the Secretary shall consider placement in the least restrictive setting available after taking into account the alien's danger to self, danger to the community, and risk of flight. Such aliens shall be eligible to participate in

15

alternative to detention programs, utilizing a continuum of alternatives based on the alien's need for supervision, which may include placement of the alien with an individual . . . sponsor").

As explained above, Petitioner has a high liberty interest at stake. First, during the eighteen months while on release, Petitioner developed attachments to life. His aunt became his legal guardian, he meaningfully integrated into the family, he obtained work authorization, and he maintained lawful employment. (Doc. 4-12 at 2; Doc. 4-13 at 2–4; Doc. 4-14 at 2.) Second, the IJ already found that Petitioner does not pose a danger, that any flight risk is mitigated by a $5,000 bond, and that Petitioner should be released. (Doc. 4-16.) As such, the IJ determined that the least restrictive setting for Petitioner is to return to the custody of his aunt, his familial sponsor and legal guardian. (*See* Doc. 4-14 at 2.) Despite this determination, DHS chooses to ignore § 1232(c)(2)(B)'s clear mandate to consider the "least restrictive setting."

The risk of erroneous deprivation is high because the "automatic stay provision creates an extreme risk of erroneous and arbitrary confinement" for several reasons. *Otilio B.F.*, 2025 WL 3152480, at *10 (citing *Herrera*, 2025 WL 2581792, at *10). As this Court explained,

> First, the text of the regulation provides no identifiable standard that would guide any purported due process procedures. *Id.* The regulation may be invoked by DHS "[i]n any case in which DHS has determined that an alien should not be released . . ." 8 C.F.R. §1003.19(i)(2). "Such an undefined and subjective standard clearly creates a likelihood of 'arbitrary and capricious application." *Herrera*, 2025 WL 2581792, at *10. Additionally, the automatic stay harms only "those detainees who have already prevailed in a judicial hearing." *Gunaydin v. Trump*, 784 F. Supp. 3d 1175, 1187 (D. Minn. 2025). The "challenged regulation permits an agency official who is also a participant in the adversarial process to unilaterally override" a neutral decisionmaker's finding, without making any findings of her own. *Id.*

8 C.F.R. § 1003.6(c)(1)(i)–(ii) may have mean to provide such procedures needed to prevent an erroneous deprivation of liberty. Moreover, even if 8 C.F.R. § 1003.6(c)(1)(i)–(ii) provided the means necessary to prevent an erroneous deprivation of liberty, such procedures were not followed in this case. The regulation provides that the stay will lapse if DHS fails to obtain a certification by a senior legal official that approves the notice of appeal as in accordance with internal review procedures and importantly, is satisfied that continued detention is supported by evidentiary support and legal arguments. There is no indication that Respondent's received such

16

certification. (*See* Doc. 9.)  Additionally, even if they had, Respondents' "basis for [] appeal"—namely, that Petitioner is subject to mandatory detention under § 1225(b)(2)—has little to no merit. (Doc. 9 at 1.)  And again, DHS's failure to abide by § 1232(c)(2)(B)'s clear mandate regarding providing the "least restrictive setting" to non-citizens under the TVPRA suggests that Respondents are engaging in an arbitrary and capricious application of the regulation.

Finally, the government's interest to keep the Petitioner detained stems from a desire to protect the public from harm and prevent the non-citizens' flight.  *Otilio B.F.*, 2025 WL 3152480, at *11 (citing *Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1208 (9th Cir. 2022)).  However, such interests are adequately protected by having a neutral adjudicator evaluate whether a noncitizen presents these risks.  *Id*. (citing *Herrera*, 2025 WL 2581792, at *11).  A neutral decisionmaker did so here and found those interests did not justify petitioner's continued detention.  (Doc. 4-16.) Furthermore, Respondents can continue to preserve the BIA's authority and limit the necessity of judicial intervention by using the emergency stay provision instead.  *See* 8 C.F.R. § 1003.19(i)(1) ("The [BIA] has the authority to stay the order of an [IJ] redetermining the conditions of custody of an alien when [DHS] appeals the custody decision or on its own motion. DHS is [then] entitled to seek a discretionary stay (whether or not on an emergency basis) from the Board in connection with such an appeal at any time."). Accordingly, Petitioner is likely to succeed on his due process claim that 8 C.F.R. § 1003.19(i)(2) is unlawful as applied to him.

**B.  Irreparable Harm**

As for the second *Winters* factor, it is "well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'"  *Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir. 2017) (citations omitted).  Because Petitioner is likely to succeed on the merits of his due process claim, he has "carried [his] burden as to irreparable harm."  *Id*. at 995. As the Supreme Court has recognized, incarceration "has a detrimental impact on the individual" because "it often means loss of a job" and "disrupts family life."  *Barker v. Wingo*, 407 U.S. 514, 532–33 (1972).  Accordingly, the Court finds that Petitioner faces irreparable harm absent injunctive relief.

*///*

17

**C. The Balance of the Equities and Public Interest**

Finally, the balance of the equities and the public interest tip in favor of granting injunctive relief. When the Government is the nonmoving party, "the last two *Winter* factors merge." *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023) (citations omitted). As discussed above, Petitioner has a strong interest in an individualized bond hearing so he can exercise his rights under the Constitution and have an opportunity to abate the imminent harms described above. *Perera*, 2021 WL 2400981, at *5. And granting relief would not deprive the Government of the opportunity to prove to a neutral decisionmaker whether Petitioner poses a threat to the community or a flight risk such that detainment is necessary. *Id.*

The public interest also weighs in Petitioner's favor. "The public has a strong interest in upholding procedural protections against unlawful detention, and the Ninth Circuit has recognized that the costs to the public of immigration detention are staggering." *Diaz v. Kaiser*, No. 3:25-cv-05071, 2025 WL 1676854, at *3 (N.D. Cal. June 14, 2025) (citing *Jorge M.F. v. Wilkinson*, No. 21-CV-01434-JST, 2021 WL 783561, at *3 (N.D. Cal. Mar. 1, 2021)); *see also Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005).

All this leads the Court to conclude that Petitioner has demonstrated a due process violation regarding the applicable statutes and regulations sufficient to warrant his immediate release on bond.

**D. Bond**

Petitioner asks this Court to waive the bond requirement. (Doc. 4-4 at 19.) "The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The Court has "discretion as to the amount of security required, if any," and it "may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or his conduct." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) (citation modified).

Because the IJ found that Petitioner posed "a flight risk," which is mitigated by the

payment of a $5,000 bond, (Doc. 4-16 at 2), a failure to post such bond may harm the Government in a legally cognizable way. *Zepeda v. U.S. Immigr. & Nat. Serv.*, 753 F.2d 719, 727 (9th Cir. 1983). Thus, the Court does not find that a bond is required as security for the preliminary injunction issued here. However, this does not relieve Petitioner of compliance with the IJ's order that he post a $5,000 bond.[7]

**VI.    CONCLUSION AND ORDER**

1.    Petitioner's Motion for Temporary Restraining Order (Doc. 4) is converted into a Preliminary Injunction and is **GRANTED.**

2.    Petitioner **SHALL** post a $5,000 bond according to the requirements of the U.S. Immigration Court as ordered by the Immigration Judge on December 23, 2025. **Within three Court days**, Respondents **SHALL** make arrangements to accept Petitioner's bond payment, provide Petitioner with instructions on how to make payment, and notify Petitioner when the portal is ready for payment. Upon payment, Respondents are **ORDERD** to immediately release the Petitioner under his former conditions of release.

3.    Respondents are **ENJOINED** and **RESTRAINED** from re-detaining Petitioner under 8 U.S.C. § 1225(b)(2) unless upon a change of circumstances. If Respondents seek to re-detain the Petitioner, Respondents **SHALL** provide no less than a seven-days' advance notice and **SHALL** hold a pre-deprivation bond hearing before a neutral decisionmaker, where the government bears the burden of demonstrating by clear and convincing evidence that Petitioner is a flight risk or danger to the community such that his physical custody is justified.

4.    The matter is **REFERRED** to the assigned magistrate judge for consideration of the merits of the petition. The Court sets the following briefing schedule, which may be modified by the assigned magistrate judge as necessary:

a.    To the extent Respondents wish to file a brief responsive to the merits of the petition, they **SHALL** do so **within 21 days**. Should they choose not to do so, they **SHALL** file a notice indicating they wish to stand on their current filings.

---

[7] Petitioner's aunt indicates that she is willing and able to post a reasonable monetary bond on behalf of her nephew. (Doc. 4-14 at 3.)

b.       Petitioner may file a traverse to any addition brief Petitioners file **within 14 days** thereafter. If Respondents do not file an additional brief, the matter will stand submitted upon filing of Respondents' notice, unless the magistrate judge chooses to hold a hearing.

IT IS SO ORDERED.

Dated:   **January 29, 2026**

UNITED STATES DISTRICT JUDGE